Filed 4/1/14  Russo v. Sanofi-Aventis, U.S. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JAMI RUSSO, | B246717 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC435846) |
| v. | |
| SANOFI-AVENTIS, U.S. etc. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Richard L. Fruin, Judge.  Affirmed.

Law Offices of Dale M. Fiola, Dale M. Fiola for Plaintiff and Appellant.

Morgan, Lewis & Bockius, Michael L. Banks and Larry M. Lawrence for Defendants and Respondents.

## INTRODUCTION

Plaintiff and appellant Jami Russo appeals from a summary judgment under Code of Civil Procedure section 437(c), in favor of defendants and respondents Sanofi-Aventis, U.S. (Sanofi) and Stephen Lee (Lee) regarding plaintiff's employment-related claims. The trial court granted summary judgment in favor of defendants because it granted summary adjudication on most of the issues for which defendants sought summary adjudication. Plaintiff contends that the trial court erred in granting defendants' motion for summary judgment. We affirm.

## FACTUAL BACKGROUND[1]

In August 2006, plaintiff became employed by Sanofi as a senior sales representative, selling pharmaceutical products within her territory, and from that date through December 2008, Lee was plaintiff's direct supervisor. Su Lehmann was Lee's immediate supervisor. Plaintiff's employment with Sanofi was terminated on April 16, 2009, when she was 42 years old.

In early August 2006, during plaintiff's first telephone conversation with Lee, Lee asked plaintiff whether she was married and had children. When plaintiff replied that she was not married and did not have children, Lee stated to plaintiff that he "would not have hired a woman like" plaintiff and did not ask about her professional qualifications.

In late August 2006, plaintiff had to take a mandatory test regarding one of Sanofi's pharmaceutical drugs. Lee met with plaintiff in a hotel lobby, but required plaintiff to go with him to a hotel guestroom, with a bed in it, to take the test. Plaintiff is not aware of any other senior sales representative taking a test in a hotel room.

In September 2006, Lee assigned plaintiff to train with Alicia Tozier, stating that she was "the best." Lee discussed with plaintiff that Tozier wanted to be a manager, but

---

[1]     Pursuant to the applicable standard of review discussed below, we state the facts in the light most favorable to plaintiff as the party against whom summary judgment was entered. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.)

said that there was a male candidate he had in mind for that role. Lee said that it took him five years to become a manager, and Lee said that Tozier was "not going to get the job" before Lee. Tozier earned sales awards for 2006, and thereafter left Sanofi after she was not promoted to a manager's position.

In October 2006, plaintiff received a score of 98 percent in the baseline assessment regarding one of Sanofi's drugs, and a score of 100 percent regarding another one of Sanofi's drugs. These scores were excellent when compared to plaintiff's peers, who scored lower. When plaintiff reported her scores to Lee, he told her "that is not good enough. You should have done better." In November 2006, plaintiff telephone Lee and left him a voice mail message that her final scores for two of Sanofi's drugs were 100 percent, but he "never commented" on it.

In late 2006 and early 2007, Lee told plaintiff that he was in control of her career within Sanofi and that she had "better not apply for any other job unless [she] was absolutely sure [she] already had it, "because "he would not recommend [her]." Lee stated that plaintiff had to go through him for any career advancement. At about this same time, Lee said to some of Sanofi's employees, "Managers don't like old Reps." Lee also said to plaintiff that in his culture women cannot say "no" to men and women are "second to men," and that if his wife ever said "no" to Lee's father, Lee's father would never talk to her again.

In early 2007, plaintiff witnessed what she believed was a violation of the "Anti-Kickback laws." Sanofi's sales representatives were assigned to work in groups, called a "pod." Each representative, including plaintiff, were allocated funds to spend on marketing efforts, including "speaker fees" paid to doctors selected to give presentations about Sanofi drugs at educational meetings. Lee refused plaintiff's "pod" to use a particular doctor to speak at an educational meeting, stating that the doctor was "already" prescribing Sanofi drugs and that he "had enough of" that doctor's "volume." Plaintiff understood Lee's comment to mean that he desired to pay speaker fees to a doctor who was not already prescribing Sanofi drugs or whose prescription volume Lee desired to

3

increase and, therefore, plaintiff concluded that this was "in violation of the Anti-Kickback laws."

In early 2007, plaintiff attended a luncheon with others, including the doctor whom Lee had refused plaintiff's "pod" to use to speak at an educational meeting. Plaintiff "tried to speak [to the doctor] to arrange a later visit" and, as the doctor was walking out of the room, he said to plaintiff and the others from Sanofi that were in attendance, "I'm not writing your drug until you pay me." While driving home from the doctor's office, Lee said to plaintiff that she "ruined the lunch," directed plaintiff to "keep [her] mouth shut and don't be a fink," and, according to plaintiff, essentially said to her, "I don't want to hear about any of this stuff; [y]ou can't go around me, above me, I control your future."

On approximately May 7, 2007, Lee sent an email to plaintiff and several other female employees attaching a video production entitled "A Few Good Expenses" the movie, "A Few Good Men." The theme of the video was about Sanofi employees seeking reimbursement from Sanofi as a business expense in their expense reports for inappropriate matters. The video used as example explanations for lap dances at strip clubs.

In approximately May 2007, plaintiff asked Lee for a raise, but Lee responded that she "didn't deserve much." When plaintiff questioned Lee about his statement, Lee stated that "there are younger guys with kids, just waiting for your job," and that she "should just be quiet" and "take whatever you get." When plaintiff asked "about" a cost of living increase, Lee said Sanofi did not allow a cost of living increase and "if you don't like it, tough, because he "could hire a younger person, that would be more productive for less money, so that wasn't happening." Lee also said that he had been allocated a certain amount of money to give to his staff based on reviews, and he chose to give the majority of that money to one man. Later, plaintiff received a letter stating that she received an increase of less than one percent of her salary—less than $20 each paycheck. Lee declared that he gave one person, a man, an "exceeds expectations" rating

4

because, among other things, he assisted Lee in training other sales professional's in Lee's group.

In mid-2007, plaintiff and Lee were in a car and Lee said that plaintiff "was not visible enough." When plaintiff attempted to discuss the subject with Lee, Lee interrupted, raised his voice and leaned over to plaintiff and yelled "stupid" at her. Plaintiff became so upset and afraid of Lee that she could not drive the car and had to pull over. Plaintiff was "severely, emotionally upset," and was in apprehension for her safety because in a previous conversation he had commented that he had a black belt in martial arts. Prior to this occasion, Lee told plaintiff about a similar incident he had with another female coworker in which he had berated her and got so angry he had to get out of the car to calm himself.

In about July 2007, at a team meeting, Sam Swarz, a Sanofi employee, told plaintiff and the other meeting attendees, that certain doctors "needed to be paid 'speaker fees' in order for them to prescribe [two of Sanofi's drugs]." Plaintiff was shocked and felt extremely uncomfortable by the statement because she had been trained that, under the Federal Anti-kickback Law, it was illegal to do that and anyone who did could be criminally prosecuted. Plaintiff believed that certain doctors were demanding paying money to write prescriptions for Sanofi drugs, and Swarz and Lee were selecting such speakers and paying them, and this was a violation the law. Plaintiff declared that she refused to participate in this "illegal conduct," believed that she was being pressured by Lee and Swarz to do something illegal and morally wrong, and refused to hire speakers that she "believed were being paid in exchange for their prescriptions and medication sales."

On about August 10, 2007, plaintiff was placed on medical leave absence from Sanofi because she had neck and back pain; plaintiff's medical leave ended February 28, 2008. While plaintiff was on medical leave, Lee demanded to know the details of plaintiff's medical conditions and the reasons that she could not work, referring to plaintiff's disabilities as an inconvenience for him and an impediment to plaintiff's completion of her work-related duties.

5

Plaintiff declared that on approximately February 29, 2008, her doctor released her to return to work but placed work restrictions on her— she was not permitted to lift over 5 pounds, and her workdays were limited to no more than eight hours a day. Kathleen Ward, a human resources analyst for Sanofi declared that plaintiff advised Sanofi's third-party administrator, Comprehensive Health Services (CHS) of two work restrictions for which she required accommodation: (1) no lifting over 5 pounds, and (2) standing/walking was limited to eight hours a day. The work restrictions were to remain in place through March 13, 2008.

Lee declared that he and plaintiff engaged in an interactive process to determine how to accommodate plaintiff's work restrictions. Lee declared that he told plaintiff that she did not have to carry her laptop with her, but instead, she could keep notes of her sales calls to enter them later in the computer system; and she was allowed to bring to sales calls only those aids she felt would be useful and within the weight restriction and he allowed her to make sales calls without bringing along samples. Plaintiff declared that Lee never told her that she did not have to carry her laptop with her, but instead, she could keep notes of her sales calls to enter them later in the computer system.

Lee declared that to accommodate plaintiff's standing/walking restriction, he allowed defendant two days of home study, where she could sit as needed. Plaintiff declared that Lee provided her and "everyone else" two days of home study and therefore this was not an accommodation. Plaintiff was told that her full-time "field duties" could commence on March 6, 2008. Plaintiff's field duties were not expected to exceed eight hours a day, a "significant amount" of that time did not require her to walk or stand. In addition to plaintiff's "field duties," she was expected to perform additional tasks, such as administrative work and training, which can be accomplished while she was sitting down.

Plaintiff declared that her work restriction "was not just 'standing/walking;'" instead, she was restricted from working beyond eight hours a day. Lee "overloaded [her] with excess work forcing [her] to exceed the eight-hour work restriction."

On approximately February 29, 2008, plaintiff directed an email to Weber of Sanofi's human resources department, copying Lehmann, a regional manager with

6

Sanofi, complaining about being sexually harassed and discriminated against by Lee, and that she feared retaliation. The e-mail stated in part, "The problem at hand is that [Lee] has an unrelenting combative behavior towards me that consists of personal attacks, accusations and unprofessional behavior which, at times, has become volatile, aggressive, disrespectful and includes negative, harassing and discriminatory comments pertaining to my age, and gender."

In approximately March 2008, Lee provided a written performance review of plaintiff in which Lee gave plaintiff as rating of "meets expectations," instead of the higher ratings of "strong," "above expectations," or "exceeds expectations." On March 11, 2008, plaintiff attended a meeting with Lehmann, Lee, and Weber to discuss her February 29, 2008, e-mail complaining about Lee's conduct. They discussed plaintiff's complaints of harassment, the making of age and sex comments, and about the verbal attack in the car where he called her stupid. Lee was hostile during the meeting and was reprimanded by Lehman. Lee said plaintiff's "needs were trivial." Plaintiff was told the meeting would have to be reconvened at a later time, but that never happened. Lee took away from plaintiff portions of the drug samples and "Opportunity Funds" that plaintiff believed should have been allotted to her and gave the funds to Swarz.

In March and April 2008, plaintiff reported Swarz's statement that certain doctors needed to be paid 'speaker fees' in order for them to prescribe Sanofi's drugs. Lee instructed plaintiff to "just do what Sam [Swarz] says." According to plaintiff, Lee previously told her "don't be a snitch." In April and May, 2008, plaintiff had telephone conversations with the U.S. Food and Drug Administration (FDA) "about [her] concerns about kick-backs." On or about May 15, 2008, plaintiff had a meeting with the FDA during which she reported the payment of speaker fees to doctors as kick-backs to influence their writing of prescriptions of Sanofi drugs.

During a meeting on approximately April 30, 2008, a Sanofi district manager waved in the air an e-mail that plaintiff had sent, saying to plaintiff that "you're ridiculous." In July 2008, Lee provided plaintiff with a "coaching letter" stating in part that plaintiff had a "lack of understanding of [Sanofi's] Core Values of Respect and

7

Solidarity, working effectively, teamwork, insubordination, and lack of attention to expense reporting duties." Anne Trautman, in Sanofi's human resources department, declared that Sanofi's employee relations policy applicable to plaintiff states that "'[a]s a part of ongoing feedback[,] a Coaching Letter is required . . . The Coaching Letter does not impact the employee's bonus eligibility, Annual Performance Adjustment, Annual Performance Rating, ability to post for other positions and eligibility for awards.'"

On August 6, 2008, plaintiff told Lee that, pursuant to medical instructions, she could not lift or carry more than 15 pounds for one month, due to an injury to her left hand or wrist she allegedly suffered in mid-July. Plaintiff initially took several days off of work, claiming that Sanofi could not accommodate a lifting restriction of 25 pounds or less. On August 8, 2008, Lee advised plaintiff, regarding plaintiff's medical restriction, to carry her items in a roller bag, lift her bag out of her car empty and then fill it with only what was necessary for a particular sales call, leave her laptop in her car, and use pre-call planning data.

On December 9, 2008, Lee received updated restrictions for plaintiff that limited her to: (1) a maximum of "10 lbs. repetitive hand activity," (2) no strong gripping, and (3) a 10 pound "lifting/carrying restriction." Lee informed his supervisor that plaintiff's work restrictions could be accommodated, and Lee's supervisor agreed. Plaintiff was then informed of the accommodation.

On December 14, 2008, an airline agent refused to allow plaintiff to board an airplane—destined for Texas in order for plaintiff to attend a training class—because plaintiff had a peanut allergy. According to plaintiff, she was not allowed to board the airplane despite advising the airline agent that plaintiff would be all right on the airplane because she was on medication to treat the condition. According to Trautman, she was notified "that Plaintiff was denied boarding after informing the airlines that her flight might have to be diverted if she were exposed to peanuts and had an allergic reaction." Subsequently, Sanofi agreed that plaintiff could complete her training at its headquarters in Bridgewater, New Jersey, between February 4 and 11, 2009.

8

On December 22, 2008, Sanofi sent plaintiff an e-mail requesting that she provide medical documentation of plaintiff's allergy to peanuts, and "the note must be provided by your current M.D. [and] must state a diagnosis, treatment plan and state why you are not able to fly."

Effective January 1, 2009, plaintiff's position with Sanofi changed from senior sales representative to FLEX representative, and she was transferred from the territory in which she worked and believes she had been successful, to working in a "geographically much larger and more onerous territory." Trautman declared that, "Plaintiff's title was 'Senior Sales Professional' during the entire time in which she was employed by [Sanofi]." Robert Calafati, a senior director of the field operations department with Sanofi, declared that, "We try to build territories to maximize business opportunities. If we have to place existing sales professionals into new roles or territories, we will consider their home addresses in relation to the geographic center of the territory. [¶] To accomplish these tasks, [Sanofi] or a third-party vendor utilizes mapping software . . . to create territories based upon the forgoing criteria. [¶] . . . [¶] [O]n January 1, 2009, there was a change in the territory for which Plaintiff worked as a result of a nationwide reconfiguration. As a result . . . five business units were reduced to two business units, and sales professionals throughout the country were assigned new territories and products . . . ."

On approximately January 26, 2009, plaintiff went to her orthopedic surgeon regarding her injured wrist and hand for which she recently made a worker's compensation claim. The orthopedic surgeon provided plaintiff with a note advising that she has a "no travel" restriction. The administrator for Broadspire, Sanofi's third party vendor for worker's compensation claims, attended plaintiff's appointment with her orthopedic surgeon and attempted to influence the doctor to remove plaintiff's "no travel" restriction. According to plaintiff, "It appears that the Broadspire person pressured the doctor's staff subsequently to alter or change the order without my knowledge . . . ."

On January 27, 2009, Trautman was informed that plaintiff could not travel because of her wrist/hand injury, and that she would not be attending the training in New

9

Jersey. Trautman asked plaintiff for the contact information for her physician so that Sanofi could engage in "the interactive process" with him and make any necessary reasonable accommodations to enable her to travel. To accommodate plaintiff's wrist/hand injury to allow her to travel, Sanofi agreed to accommodate plaintiff by providing her with assistance with her luggage, sending her materials to her destination, and providing her with "on-sight" physical therapy in New Jersey.

On January 29, 2009, [Sanofi] received a letter, purportedly from plaintiff's doctor, stating that plaintiff "has a history of peanut allergy which was diagnosed prior to December 14, 2008, for which she has been given an Epipen." Plaintiff crossed out the doctor's name, address and phone number and stated in the letter that, "This information has been demanded by. . . Trautman of Human Resources. Providing this doctor's note does not give you or Sanofi . . . permission to contact or question my doctor and is not acting as a medical release in any way form or function and am not and do not grant [Sanofi] [p]ermission to contact my physicians regarding this matter."

Also on January 29, 2009, plaintiff sent a letter to Janet Kessler enclosing a note, which plaintiff stated was from her doctor. The note stated that plaintiff "may carry [an] Epipen [medication] on [her] person for travel in an airplane because of peanut allergy." The noted crossed out the name, address and phone number of the purported doctor. Plaintiff stated in her letter to Kessler that American Airlines said that the enclosed "doctor's note is acceptable for travel with my epi-pen."

Also on January 29, 2009, plaintiff's allergist gave plaintiff a written medical restriction stating that plaintiff was "unable to fly for the next two weeks due to a sinus infection." Sanofi advised plaintiff that her sinus infection did not qualify as a serious health condition. Plaintiff then suggested that she participate in a local training in California. Trautman however informed plaintiff that it "was not a viable option" because of the need for consistency in training among sales professionals, and because the then-current business structure could not divert resources to provide individualized training.

On approximately February 2, 2009, plaintiff provided to Sanofi a note that she received from her doctor on approximately January 30, 2009, stating that plaintiff has a peanut allergy that was diagnosed prior to December 14, 2008. Plaintiff's note stated that Sanofi and its agents were not permitted "to speak with or contact [plaintiff's] physicians about any medical information" and that the note "was provided and demanded under threats of termination and duress."

Plaintiff's doctor diagnosed her with depression and anxiety which, according to plaintiff, was "as a result of all the stress [she] was under as a result of [her] work environment." On February 4, 2009, plaintiff emailed Sanofi stating that "[d]ue to recent events, my doctor has taken me out on a medical leave of absence. I have sent a doctor's note to CHS . . . . [¶] Today I followed up with a phone request for [Sanofi] to send me the forms that are required for STD and FMLA and I re-faxed the information again. . . ." On February 5, 2009, plaintiff submitted a request for an additional FMLA leave of absence, stating that she "was unable to work for two months because of stress." According to the request for leave of absence, plaintiff 's condition commenced on January 28, 2009, and it was expected to last to April 3, 2009, during which time plaintiff was "unable to perform any of [her] job functions."

On February 6, 2009, Ward, a human resources analyst for Sanofi, sent plaintiff a letter stating that plaintiff failed to provide CHS with medical documentation sufficient for approval of short term disability (STD) payments. Ward further told plaintiff that because there was no support for STD or continuation of leave, as of January 29, 2009, plaintiff is on "unpaid and unapproved personal leave" commencing on January 29, 2009.

On March 10, 2009, Trautman sent plaintiff an e-mail stating, "[Sanofi] has received your request for leave under the [FMLA]. According to our records of the hours you submitted, you have not worked the required number of hours in the previous 12 months to be eligible for leave under the [FMLA] or the Company's Family and Medical Leave Policy. Therefore your time out of work from January 29, 2009 until present is considered unapproved and unpaid leave of absence. [¶] Although [Sanofi], with your assistance, would like to consider whether there are any accommodations that it may be

11

able to provide to you that would enable you to return to work, your refusal to allow Health Management to speak with your healthcare provider has inhibited them from engaging in such an interactive process. [¶] Please also note that, upon your return to work, you must still provide the following to Health Management, as requested previously on several occasions. [¶] 1. A detailed explanation from your health care provider describing the severity of your allergy to peanuts, which is long overdue. [¶] 2. Regarding the travel restrictions for your previous worker's compensation injury, please provide specific documentation from your heath care provider explaining why you were restricted from travel, even with the offered assistance, and confirming that this was part of the initial diagnosis. [¶] Upon your return to work, you also will need to schedule training in Bridgewater as soon as possible on the subjects that you missed in the sessions that you failed to attend in December and again in January."

On March 12, 2009, plaintiff sent Trautman a letter stating that plaintiff provided Sanofi with the required medical leave documentation. On March 25, 2009, Trautman sent a letter to plaintiff stating that, "I have received your letters dated March 14, 2009. Contrary to your contentions, as you have previously been informed, you have not provided sufficient information to be approved for FMLA/CFRA leave or STD salary continuation benefits. Specifically, the FMLA leave request form that you submitted did not contain sufficient medical information to enable CHS to approve STD benefits. Moreover, due to the inconsistencies between the most recent documentation and previous documentation received from the same health care provider, CHS needs to verify the authenticity of the documentation. However, they are not independently able to do so because you have specifically prohibited [Sanofi] or its agents from contacting your doctor. Accordingly, please provide [Sanofi] or its agents with authority to contact the doctor named in your previously submitted FMLA certification, or alternatively have the doctor send the documentation directly to CHS with the appropriate seal. [¶] . . . [¶] Additionally, [Sanofi ] still needs further documentation regarding your failure to attend sales training due to your peanut allergy and wrist injury. . . . As you are aware, you were originally scheduled to attend required cross-training on December 15,

12

2008. However, you claimed that you were not allowed to board the flight on December 14, 2008 due to your peanut allergy. Your reservations for flights the next day were cancelled in the absence of peanut-free flight options. We then agreed to reschedule training for February 4, 2009; however, four (4) days prior to your scheduled departure you submitted documentation indicating—for the first time—that you were unable to travel due to a wrist injury, which you suffered in July, 2008, which notably, is prior to your original training date. [Sanofi] then offered to ship your baggage or provide other accommodations so that you could attend training, which your own doctor agreed would enable you to travel. However, you then provided yet another reason why you could not travel; specifically, that you required physical therapy, which [Sanofi] offered to provide on site in Bridgewater through Health Management. You then submitted documentation that you had a sinus infection that would prevent you from flying for two (2) weeks. When [Sanofi] informed you that a sinus infection did not qualify as a serious health condition entitling you to medical leave, you submitted unauthenticated documentation indicating that you would not be a work for two (2) months due to yet another condition, stress. [¶] [Plaintiff], as you have been informed on numerous occasions, in order to be excused from mandatory and essential job responsibilities, you must provide specific and authentic medical documentation explaining why you could not participate even with [Sanofi] offered assistance. You have repeatedly refused to do so, and have prevented [Sanofi] from obtaining this information directly from your doctor. In order to avoid any further confusion, I have outlined the specific medical documentation you are required to provide in order to avoid disciplinary action for failing to attend multiple required trainings: [¶] 1. A note from your doctor explaining that you have an allergy to peanuts, describing the severity of that allergy with all allergy test results, and verifying that you had it on December 14, 2008, the day you were unable to fly. Your doctor must also indicate the degree of severity of your allergy, for example, if someone with a comparably severe peanut allergy were exposed to peanuts, in any quantity, on an airplane they would suffer such a severe reaction—even with an epi-pen—that the flight might have to be immediately diverted to the nearest airport. The note you submitted

13

which had the name and address of the doctor crossed out and only addressed your ability to fly in the future is not sufficient. [¶] 2. With regard to the travel restrictions for your wrist, Health Management requires specific documentation from your physician stating that you were restricted from travel, even with the offered accommodations, and confirming that this was part of the initial diagnosis." The letter concludes that, "Upon your return to work you will still be required to schedule and attend mandatory product training in Bridgewater, NJ, for Plavix [one of Sanofi's drugs] and any additional content that you missed in the sessions that you failed to attend in December and again in February."

On April 2, 2009, plaintiff sent a letter to Trautman in response to Trautman's March 25, 2009, letter. Plaintiff's letter stated that "I am most happy to assist you with this information . . . [regarding plaintiff's "return to work"]. First, I must confirm that my physicians have provided written documentation to both CHS and Broadspire pertaining to work injuries. [¶] . . . [¶] I have forwarded the required [peanut] allergy documentation to CHS and Janet Kessler on numerous occasions along with . . . my physicians RX note pad stating her medical license number (verify validity) and an additional letter was provided from my Allergist (on her business letter head) dated January 30, 2009 which does specify when I was seen last, when I was diagnosed and what medications I have been given as well as providing an acceptable note that allows me to travel with an epi-pen which has been confirmed with the airlines as sufficient for travel (verified)." Plaintiff explained why she was not allowed by an airline representative to board the airplane scheduled to depart on December 14, 2008. The letter continued by stating, "I believe that the above detail should be sufficient to resolve any outstanding questions pertaining to Dallas Plavix Cross Training, American Airlines and Sanofi . . . errors as well as allergies. With that being said, it is clearly not necessary to contact my physician, you have . . . already been provided with all the pertinent medical documentation and information and I do not intend on consuming anything of which I am allergic." Plaintiff also stated that she had completed training in Plavix, was

14

licensed to sell Plavix according to the Sanofi procedures, and had passed the Plavix exams with scores of 90 percent or above.

On April 9, 2009, Trautman sent a letter to plaintiff, "[You fail] to address the primary point of my March 25, 2009 request for authentication of the medical documents pertaining to your current, and continuing absence. . . . In the absence of proper authentication of the medical forms you provided for your current leave—either by allowing us to contact the doctor listed on the form, or by direct delivery of the documentation by the doctor to CHS with the appropriate stamp—we consider your documents insufficient to support medical leave. Consequently, your time out of work from January 29, 2009 until present is considered unapproved and remains unpaid. [¶] Therefore, you are required to immediately return to work to perform all duties associated with your Senior Sales Professional position. If you do not return to work on or before Monday, April 13, 2009, 8:00AM PST, you will be deemed to have abandoned your position and your employment will terminate on that date."

On April 16, 2009, Trautman directed a letter to plaintiff, stating, "We have written to you on numerous occasions requesting authentication of the medical documents pertaining to your most recent absence. Instead, you have patently ignored our requests . . . . [¶] As I informed you on April 9th, 2009, in the absence of documents or information supporting your leave, you were required to return to work . . . on April 13, 2009. Since you failed to do so—in accordance with my prior warnings—you are considered to have abandoned your position and your employment with [Sanofi] is being terminated today."

**PROCEDURAL BACKGROUND**

Plaintiff filed a complaint against defendants alleging causes of action for sexual harassment in violation of the FEHA[2] (first cause of action), violation of California Labor Code section 1102.5 (eighth cause of action), and intentional infliction of emotional

---

[2]     California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.).

15

distress (tenth cause of action), and alleging causes of action against Sanofi for retaliation (second cause of action), actual disability discrimination (third cause of action), perceived disability discrimination (fourth cause of action), failure to provide reasonable accommodation (fifth cause of action), failure to engage in the interactive process (sixth cause of action), wrongful termination in violation of public policy in the FEHA (seventh cause of action), and wrongful termination in violation of public policy California Labor Code section 1102.5 (ninth cause of action).

Defendants answered the complaint, and subsequently filed a motion for summary judgment or, alternatively, summary adjudication of issues, scheduled to be heard on set for hearing on September 21, 2012. On September 11, 2012, after plaintiff's opposition to defendants' motion was due, plaintiff filed ex parte application to continue the hearing on the motion, and the trial court granted a continuance of the hearing on defendant's motion to September 28, 2012. Plaintiff opposed the motion, and the trial court subsequently continued the hearing on the motion to October 16, 2012. At the October 16, 2012 hearing, the trial court heard argument of counsel regarding the motion and took the matter under submission.

On November 20, 2012, the trial court issued a written ruling on the motion, granting summary adjudication of issues on Issue Nos. 1, 3-9, 11-14, not ruling on Issue No. 2, and denying summary adjudication of issues on Issue No. 10. The written ruling stated, "Having GRANTED summary adjudication on most of defendants' issues, the court GRANTS summary judgment for defendants." The trial court entered an order granting defendants' motion and a judgment in favor of defendants and against plaintiff "on all her causes of action." Plaintiff timely appealed the judgment.

## DISCUSSION

### A. Standard of Review and Applicable Law

"A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action by showing that one or more elements of the cause

16

of action cannot be established or that there is a complete defense to that cause of action. [Citation.]  Once the defendant has made such a showing, the burden shifts back to the plaintiff to show that a triable issue of one or more material facts exists as to that cause of action or as to a defense to the cause of action.  [Citation.]" (*Moser v. Ratinoff* (2003) 105 Cal.App.4th 1211, 1216-1217.)

"We review the grant of summary judgment de novo.  [Citation.]  We make 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' [Citation.]" (*Moser v. Ratinoff, supra,* 105 Cal.App.4th at p. 1216.)

"Summary adjudication is proper if the papers submitted show there is no triable issue as to any material fact and the moving party is entitled to prevail on a cause of action as a matter of law.  [Citations.]" (*Kight v. CashCall, Inc*. (2011) 200 Cal.App.4th 1377, 1386-1387.)  "'There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.'  [Citation.]" (*Lidow v. Superior Court* (2012) 206 Cal.App.4th 351, 356.)

"In reviewing an order granting summary adjudication, 'we apply the same standard of review applicable on appeal from a grant of summary judgment.  [Citation.] Accordingly, "'. . . we take the facts from the record that was before the trial court when it ruled on that motion.  [Citation.]  "'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.'"  [Citation.]  We liberally construe the evidence in support of the party opposing summary [adjudication] and resolve doubts concerning the evidence in favor of that party. . . .'"'  [Citations.]" (*Rehmani v. Superior Court* (2012) 204 Cal.App.4th 945, 950-951; *Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 678; *Wiener v. Southcoast Childcare Centers, Inc.*, *supra,* 32 Cal.4th at p. 1142.)  We must consider all of the evidence and all of the inferences reasonably drawn therefrom, and must view such evidence and such inferences in the

light most favorable to the party opposing summary judgment.  (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 843.)

"The trial court's stated reasons for granting summary relief are not binding on the reviewing court, which reviews the trial court's ruling, not its rationale.  [Citation.] (*Lidow v. Superior Court*, *supra*, 206 Cal.App.4th at p. 356.)  "We affirm an order granting summary adjudication if it is legally correct on any ground raised in the trial court proceedings.  [Citation.]"  (*Kight v. CashCall, Inc., supra*, 200 Cal.App.4th at p. 1387.)

For employment discrimination claims, the plaintiff has the initial burden of establishing a prima facie case of discrimination.  The burden of going forward with the evidence then shifts to the defendant to produce evidence of a legitimate nondiscriminatory reason for the action taken against the plaintiff.  The burden of going forward with the evidence then shifts back to the plaintiff to produce evidence showing the employer's reason is false and a pretext for unlawful discrimination.  (*McDonnell Douglas Corp. v Green* (1973) 411 U.S. 792, 802-803; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354.)  On a motion for summary judgment, California applies "the burden-shifting analysis of *McDonnell Douglas Corp. v Green*[,*supra*,] 411 U.S. 792" to a claim for retaliation.  (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1108-1109).  This "burden-shifting analysis" therefore is applicable to plaintiff's second cause of action for retaliation, third cause of action for actual disability discrimination, fourth cause of action for perceived disability discrimination, eight cause of action for violation of Labor Code section 1102.5, and ninth cause of action for wrongful termination in violation of public policy based on Labor Code section 1102.5.

### B.　　Sexual Harassment in Violation of the FEHA

Plaintiff's first cause of action is for sexual harassment in violation of the FEHA, alleged against defendants.

18

### 1. Applicable Law

California law prohibits sexual harassment in the workplace. (Gov. Code, § 12940 (j)(1).**3**) "The FEHA 'declares certain kinds of discrimination and harassment in the workplace to be "unlawful employment practice[s]." [Citation.]'" (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 471.)

An action for hostile work environment constituting sexual harassment lies when the conduct at issue is so severe or pervasive that it alters the conditions of the employee's employment and creates an abusive work environment. (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 609.) A plaintiff must prove that the offending conduct would have interfered with the work performance of a reasonable employee of the same sex, would have seriously affected a reasonable employee's psychological well-being, and that she was actually offended. (*Id*. at pp. 609-610 & fn. 8.)

"[T]he existence of a hostile work environment depends upon 'the totality of the circumstances.' [Citation.] '[T]o be actionable, "a sexually objectionable environment must be both objectively and subjectively offensive … ."'" Therefore, 'a plaintiff who subjectively perceives the workplace as hostile or abusive will not prevail . . . if a reasonable person . . ., considering all the circumstances, would not share the same perception.' [Citation.]" (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1044.) "[A]n employee seeking to prove sexual harassment based on no more than a few isolated incidents of harassing conduct must show that the conduct was 'severe in the extreme.' [Citations.]" (*Id*. at p. 1043)

"In evaluating the totality of the circumstances [to determine the existence of a hostile work environment, the following factors can be considered:] (1) the nature of the unwelcome sexual acts or works (generally, physical touching is more offensive than unwelcome verbal abuse); (2) the frequency of the offensive encounters; (3) the total number of days over which all of the offensive conduct occurs; and (4) the context in

---

**3** All statutory citations are to the Government Code unless otherwise noted.

which the sexually harassing conduct occurred. [Citation.]" Conduct that is occasional, isolated, sporadic or trivial is not "sufficiently pervasive" to establish actionable sexual harassment. (*Fisher v. San Pedro Peninsula Hospital*, *supra*, 214 Cal.App.3d at p. 610.) "[R]ather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature." (*Ibid*.) "That is, when the harassing conduct is not severe in the extreme, more than a few isolated incidents must have occurred to prove a claim based on working conditions. [Citations.] Moreover, when a plaintiff cannot point to a loss of tangible job benefits, she must make a '"commensurately higher showing that the sexually harassing conduct was pervasive and destructive of the working environment."' [Citations.]" (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 284; *Fisher v. San Pedro Peninsula Hospital*, *supra*, 214 Cal.App.3d at p. 610.)

### 2.    *Background Facts*

Plaintiff alleged in her first cause of action, "Lee's actions created a hostile and intimidating working environment. [¶] Lee was a District Manager, with authority over Plaintiff and over hiring and firing. Moreover, Plaintiff reported Lee's harassment to the [Sanofi], which failed to properly investigate the same or take appropriate corrective measures. Thus, [Sanofi] is jointly and severally liable for Lee's harassment."

Defendants' motion sought summary adjudication on issue no. 1: that plaintiff's first cause of action failed because plaintiff cannot establish a prima facie claim. The trial court granted summary adjudication in favor of defendants on this issue, stating, "Plaintiff alleges a hostile work environment theory of sexual harassment. She has the burden of showing 'that the harassing conduct was "severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their sex."' There is no recovery for harassment that is occasional, isolated, sporadic, or trivial. [¶] The specific instances of sexual harassment claimed by plaintiff are sporadic, few in number and not blatant. Plaintiff claims Lee, in his first telephone call after her hiring, asked whether she was married or had children, then telling her he would not hire a woman like her . . .; that Lee

20

after meeting her in late August, 2006 in a hotel lobby required her to take a company written test 'in a hotel guestroom, with bed,' . . . that Lee told her in late 2006/early 2007 that in his culture women were inferior to men, Id. at 27; that on May 7, 2007 Lee circulated an email to the reps who reported to him, including, besides plaintiff, several other female reps, a video parody of the movie 'A Few Good Men,' . . . . [Plaintiff] also complained of a number of incidents having sexual overtones at Sanofi's National Sales Conference in Las Vegas, but these incidents did not involve plaintiff's supervisor Stephan Lee. . . . [¶] Plaintiff's email complaint of February 29, 2008 to . . . Weber does not identify specific incidents of sexual harassment. It reads: 'The problem at hand is that [Lee] has an unrelenting combative behavior towards me that consists of personal attacks, accusations and unprofessional behavior which, at times, has become volatile, aggressive, disrespectful and includes negative, harassing and discriminatory comments pertaining to my age, and gender.' . . . Most of the specific incidents that are identified in [plaintiff]'s declaration are ageist rather than sexual comments. (Plaintiff was 42 when she was terminated.) [¶] Plaintiff's evidence does not raise a triable issue that Lee's comments to her or any other conditions of her employment constituted sexual harassment." (Footnote omitted.)

###### 3.     *Analysis*

Plaintiff contends that in finding that the specific instances of sexual harassment claimed by plaintiff are sporadic, few in number and not blatant, the trial court erred because it focused on only a few of the instances—plaintiff's telephone call with plaintiff during which Lee asked plaintiff whether she was married or had children and telling plaintiff he would not hire a woman like her; Lee's requirement that plaintiff to take a company written test 'in a hotel guestroom, with bed;' Lee's telling plaintiff that in his culture women were inferior to men; Lee's circulation of an email to the sales representatives who reported to him, including plaintiff and several other females, a video parody of the movie 'A Few Good Men;' plaintiff's complaint of a number of incidents having sexual overtones that did not involve Lee.

21

At least two of these purported instances of sexual harassment did not occur because of plaintiff's sex or did not amount to sexual harassment. Lee's telling plaintiff that in his culture women were inferior to men did not express Lee's personal views but was merely an expression of the views of his "culture." Regarding Lee's circulation of an email attaching a video parody of the movie, "A Few Good Men," the theme of the video was to advise Sanofi employees that they could not seek reimbursement as a business expense for certain expenditures; in particular, paying for lap dances at strip clubs. Plaintiff stated in her answers to interrogatories propounded by Sanofi that Lee was "joking about expensing lap dances." This does not amount to sexual harassment. It is not reasonable to believe that the illustration was because of plaintiff's sex, nor was it directed at women in general. In addition, the video was not introduced into evidence before the trial court, and is not contained in the record, and, therefore, plaintiff failed to establish that this incident was severe or pervasive.

On appeal, plaintiff provides a list of 24 items that she contends is the totality of circumstances constituting a hostile work environment based on sexual harassment: "1. Lee informed [plaintiff] that another female employee would not get the job before him and that he had a male candidate in mind[;] [¶] 2. Lee comments that [plaintiff]'s training scores were 'not good enough[; y]ou should have done better[;]' [¶] 3. Lee told [plaintiff] that, 'Managers don't like old Reps (referring to [plaintiff] as 'old')[;] [¶] 4. Lee informed [plaintiff] that he was in control of [plaintiff]'s career and that she better not apply for any other job unless [she was] absolutely sure [she] already had it 'because he would not recommend [her ;]' [¶] 5. During a ride along, Lee yelled at [plaintiff] calling her 'stupid[;]' [¶] 6. Lee said he had a black belt in karate and could use it if he needed, placing [plaintiff] in fear for her safety [;] [¶] 7. Lee sent offensive emails to [plaintiff] and other staff about lap dances[;] [¶] 8. After reporting illegal kickbacks, Lee told her that she ruined the lunch and 'to keep your mouth shut and don't be a fink[;]' [h]e further said, 'I don't want to hear about any of this stuff; you can't go around me, above me, I control your future[;]' [¶] 9. Lee told [plaintiff] after she had asked for a raise, 'there are younger guys with kids, just waiting for your job,' and that she 'should

22

just be quiet' and 'take whatever you get[;]' [¶] 10. After [plaintiff] declined to participate in illegal conduct and informed Lee of her declination, Lee told [plaintiff] 'just do what Sam [Swarz] says' and 'don't be a snitch[;]' [¶] 11. After [plaintiff] was placed on medical leave on August 10, 2007, Lee informed [plaintiff] 'you interfered with my schedule by being sick[;]' [h]e then instructed her to call him and demanded an explanation and details of her illness[;] [¶] 12. While on approved leave, Lee interviewed candidates to replace her and then moved all of the funds necessary for her to perform her job duties to Swarz[; s]he learned when she returned to work that Lee had made Swarz the 'pod manager[;]' [¶] 13. During a meeting to discuss [plaintiff]'s workplace complaints against him, Lee said, [plaintiff's] 'needs were trivial [;]' [¶] 14. After [plaintiff] complained of kickback activity by Lee and Swarz, Lee threatened [plaintiff] with punishment[; h]e cancelled all meetings and drive-alongs and sent [plaintiff] a 'Return to Work Expectation Schedule' establishing unreasonable deadlines that required [plaintiff] to work all hours of the day and night[; s]he was not given funds to perform her job duties when her male co-workers were given the necessary funds[;] [¶] 15. Lee denied [plaintiff] expense reimbursement while she was on disability leave[;] [¶] 16. After sending emails to Lee and [Sanofi]'s Director of Human Resources concerning her opposition to kickback activity (Doctor's speaker fees) and after contacting the FDA, a Sales Manager referred to [plaintiff]'s email sent to Swarz as 'ridiculous[;]' [¶] 17. In July 2008, Lee presented [plaintiff] with a 'coaching letter,' and Lee placed [plaintiff] on a performance improvement plan[;] Lee also changed her job duties to Flex Representative, requiring [plaintiff] to cover more territories and more Sanofi' s products than her fellow sales team members[;] [¶] 18. Sanofi failed to abide by work restrictions imposed by [plaintiff]'s doctor (not to work more than 8 hours per day or lift over 5 lbs.)[;] [¶] 19. After informing Lee of her medical restrictions, Lee and/or Sanofi never engaged the 'interactive process[;]' [¶] 20. [Sanofi] took a 'peanut allergy'' incident and blew it out of proportion saying that [plaintiff] was unable to fly[; y]et, her allergist had only limited her to a two-week restriction because of a sinus infection[;] [¶] 21. During the time of medical restrictions, [Sanofi] demanded that

23

[plaintiff] attend mandatory product training in Bridgewater, New Jersey for Plavix, instead of accommodating her to attend local training[;] [¶] 22. On April 2, 2009, [plaintiff] sent a detailed letter to . . . Trautman, Sanofi's HR person, explaining the peanut allergy in detail, her performance and other information[;] [¶] 23. On April 9, 2009, Trautman informed [plaintiff] that her medical documents were insufficient and that if she did not return by April 13, 2009, she would be deemed to have abandoned her job[;] [and ¶] 24. On April 16, 2009, [plaintiff] was terminated."

Plaintiff fails to provide record citations for the 24 items. "'If a party fails to support an argument with the necessary citations to the record, that portion of the brief may be stricken and the argument deemed to have been waived. [Citation.]' [Citations]" (*Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 743; *Gotschall v. Daley* (2002) 96 Cal.App.4th 479, 481 fn 1.) Thus, we could consider this contention waived, but it is meritless in any event.

On February 29, 2008, plaintiff sent an email to Weber stating that, "The problem at hand is that [Lee] has an unrelenting combative behavior towards me that consists of personal attacks, accusations and unprofessional behavior which, at times, has become volatile, aggressive, disrespectful and includes negative, harassing and discriminatory comments pertaining to my age, and gender." The e-mail does not identify specific incidents of sexual harassment.

In addition, of these 24 items, only three (numbers 1, 7 and 9) are sexual in nature. Although offensive conduct need not be sexual in nature to create a hostile environment in the workplace, it must be directed at an employee *"because of his or her gender"* to create an actionable hostile environment. (2 Chin et al., Cal. Practice Guide: Employment Litigation (The Rutter Group 2012) ¶ 10:240, p. 10-49 (rev. # 1, 2012), citing *EEOC v. Nat'l Educ*. Ass'n (9th Cir. 2005) 422 F.3d 840, 845; *Boumehdi v. Plastag Holdings, LLC* (7th Cir. 2007) 489 F.3d 781, 788; *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 469.) Plaintiff has failed to set forth admissible facts that the items of non-sexual conduct was directed at plaintiff because of her sex, or that it was directed at women in general.

24

Regarding item 1 of plaintiff's list—that Lee informed plaintiff that another female employee would not get the job before him and that he had a male candidate in mind—plaintiff claimed that Lee explained that it took him five years to get his position, and he did not want another employee getting a comparable position to his without having the same amount of seniority with the company. The only connection that this has to sex is that the candidate that Lee preferred was male, as contrasted with another candidate who was female. But there is no evidence that this preference was due to gender, as opposed to the candidate's qualifications or seniority with the company.

Item 7 of plaintiff's list—that Lee sent offensive emails to [plaintiff] and other staff about lap dances—is discussed above. Regarding item 9 of plaintiff's list—that Lee told plaintiff after she had asked for a raise, "there are younger guys with kids, just waiting for your job," and that she "should just be quiet" and 'take whatever you get,"— is not offensive or harassing. In addition, there is no evidence that Lee's purported use of the term "guys" was a reference to men only, as opposed to using it as a reference to other people generally.[4] There is insufficient evidence therefore that this statement was motivated by any gender animus or directed at plaintiff because she was a woman.

A hostile work environment sexual harassment lies when the conduct at issue is so severe or pervasive that it alters the conditions of the employee's employment and creates an abusive work environment. The purported instances of sexual harassment claimed by plaintiff are sporadic, few in number, and not blatant. (*Lyle v. Warner Brothers Television Productions*, *supra*, 38 Cal.4th at p. 284; *Fisher v. San Pedro Peninsula Hospital*, *supra*, 214 Cal.App.3d at p. 610.) The trial court did not err in granting summary adjudication in favor of defendants on issue no. 1—that plaintiff did not raise triable issues of fact as to her first cause of action—because plaintiff did not set forth sufficient facts to support a prima facie claim on her first cause of action.

---

[4] A definition of guys is "people of either sex." (Concise Oxford English Dictionary (Rev'd 10th ed. 2002) p. 635.)

## C. Retaliation

Plaintiff's second cause of action is for retaliation alleged against Sanofi.

### 1. Applicable Law

"Past California cases hold that in order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. [Citations.] Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ""'drops out of the picture,'"" (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042), "and the burden shifts back to the employee to provide 'substantial responsive evidence' that the employer's proffered reasons were untrue or pretextual [citation]." (*Loggins v. Kaiser Permanente Internat.*, *supra*, 151 Cal.App.4th at p. 1109). "[T]he proper standard for defining an adverse employment action is the 'materiality' test, a standard that requires an employer's 'adverse action to materially affect the terms, conditions, or privileges of employment.'" (*Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at pp. 1036, 1050-1052.)

### 2. Background Facts

Plaintiff alleged in her second cause of action "on information and belief that she was retaliated against in the terms and conditions of her employment as described above, and her employment was terminated in retaliation for her complaints to Defendants concerning the sexual and age-related harassment by Lee. The FEHA prohibits retaliation against a person who has complained of conduct that she reasonably believes constitutes prohibited conduct under the FEHA."

As to plaintiff's second cause of action for retaliation, defendants' motion sought summary adjudication of issue no. 2: that plaintiff's second cause of action failed because

26

plaintiff cannot establish a prima facie claim, and of issue no. 3: that the cause of action failed because Sanofi had legitimate, non-discriminatory reasons for taking all alleged adverse employment actions.

The trial court did not rule on issue No. 2, stating, "As summary adjudication is granted as to plaintiff s second cause of action on Issue #3 [below], the court deems it unnecessary to rule specifically as to Issue #2." The trial court granted summary adjudication in favor of Sanofi on issue No. 3, stating, "Plaintiff alleges that she suffered adverse employment actions because she complained to her employer (1) that her supervisor Lee had acted improperly toward her and (2) that she had complained internally and to the FDA that Sanofi was improperly selecting (and compensating) certain physicians to be speakers at rep training sessions in order to influence their decisions to prescribe Sanofi products. [¶] Sanofi, in its motion, offers evidence that it had, for each of the acts plaintiff claims to be retaliatory, legitimate business reasons. The burden then shifts back to plaintiff to raise a triable issue through admissible evidence that the reason for the adverse action was discriminatory and/or retaliatory. The plaintiff must offer 'substantial responsive evidence' that the employer's stated non-discriminatory reason for the adverse action was (1) untrue or pretextual; (2) motivated by a discriminatory animus; or (3) a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination. Hersant v. Department of Social Services (1997) 57 Cal.App.4th 997, 1007 (an age discrimination employment case); Martin v. Lockheed Missiles &Space Co. (1994) 29 Cal.App.4th 1718, 1734 (an age and sex discrimination employment case). [¶] Plaintiff alleges three adverse employment actions as for retaliation. However, as to each, Sanofi has presented competent evidence that the action was not retaliatory as it was based on legitimate business reasons. Plaintiff alleges: [¶] (1.) That her supervisor [Lee] in periodic reviews evaluated plaintiff as 'meeting expectations' while plaintiff believed that she should have received an 'exceeds expectations' score. Lee supervised 8-12 sales representatives. He reserved the 'exceeds expectation' evaluation for his best performer; he provided that evaluation to only one person in plaintiff's sales team. A rating of 'meets expectations'

27

cannot constitute an adverse employment action. LaCroix v. Sears, Roebuck & Co. (8th Cir. 2001) 240 F.3d 688, 691-692. Lee objectively justified his evaluation of plaintiff. . . . [¶] (2.) That Sanofi modified plaintiff's sales territory by dropping 11 and adding 4 zip codes; and reducing the number of products she could sell within that territory. Sanofi has established that it re-organized its sales territories based on computer modeling; and that plaintiff's sales teams included other members and that they were all affected equally, both with respect to sharing the new territory and selling the same products. . . . Lee, plaintiff's supervisor, testifies that had no influence in deciding the sales territory boundaries or product portfolio for the sales representatives he supervised. . . . [¶] (3.) That Sanofi terminated plaintiff s employment. Sanofi terminated plaintiff's employment because plaintiff, having exhausted FMLA leave, did not provide sufficient medical documentation for the employer to consider a discretionary leave and because plaintiff failed to return to work even after she was advised that her continuing absence would result in her termination. . . . Plaintiff does not present any evidence that she was terminated due to any 'whistle-blower' complaints. She instead asserted her medical ailments prevented her from attending out-of-state training and then put herself on leave due to her claimed medical condition. Plaintiff refused permission for Sanofi's third party administrator to contact her physicians; and failed to provide proper medical confirmation for consideration for a discretionary medical leave. Plaintiff had exhausted her FMLA leave. She had no entitlement to a statutory leave once her FMLA leave was exhausted. Rogers v. County of Los Angeles (2011) 198 Cal.App.4th 480, 490-492. [¶] Plaintiff offers no evidence, much less than "substantial responsive evidence," that Sanofi's business reasons for its decisions affecting plaintiff's employment were pretextual. [¶] Summary adjudication is required because plaintiff has not submitted competent evidence that raises a triable issue that her employer's alleged retaliatory acts were other than a non-discriminatory, non-retaliatory business decision."

### 3. Analysis

As stated above, the trial court did not rule on issue No. 2: whether plaintiff alleged a prima facie claim for retaliation. ~(AA 8, 751)~ To establish a prima facie case of retaliation under the FEHA, a "'plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.' [Citation.]" (*Loggins v. Kaiser Permanente Internat., supra,* 151 Cal.App.4th at p. 1109).

Plaintiff contended in her opposition to defendant's motion that Sanofi retaliated against her with several adverse employment actions because she engaged in the protected activities of reporting Lee's sexual harassment, opposing Sanofi's discrimination against her for her disabilities, and opposing Sanofi's violation of the "Anti-Kickback" law.[5] Sanofi did not contend in its motion or on appeal these activities did not constitute protected activities.

In plaintiff's opposition to the motion, she contended that the acts of retaliation constituting adverse actions[6] were Sanofi "[u]nfairly downgrad[ing her] evaluation, [preparing the] coaching memo, den[ying her a] cost of living raise, transfer[ing her] to a much less desirable position in a larger more onerous territory, refus[ing] to accommodate her disability, and ultimately [terminating her]."[7]

---

[5] "Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person-- [¶] (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." (42 U.S.C. § 1320a-7b, subd. (b)(2).)

[6] In plaintiff's opposition to defendants' motion, plaintiff does not specifically identify the adverse actions allegedly taken in response to her opposing Sanofi's alleged violation of the "Anti-Kickback laws."

[7] Plaintiff appears to contend on appeal that her list of 24 items (that she argues is the totality of circumstances constituting the hostile work environment based on sexual harassment), noted above, constitute adverse actions. As stated, *ante*, plaintiff fails to

29

Many of the adverse actions claimed by plaintiff in her opposition to the motion are not adverse actions. An adverse employment action is defined as an act that materially affects the terms and conditions of employment. (*Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at pp. 1036, 1050-1052.)

Regarding plaintiff's contention that Sanofi unfairly downgraded her evaluation, plaintiff states in her reply brief on appeal that "she has not raised [the performance review] as an adverse employment action," and comments that "it is [therefore] interesting that [defendants] should raise the point in the first place." Regarding Sanofi's preparation of a coaching memo, Trautman, in Sanofi's human resources department, declared that Sanofi's employee relations policy applicable to plaintiff states that "The Coaching Letter does not impact the employee's bonus eligibility, Annual Performance Adjustment, Annual Performance Rating, ability to post for other positions and eligibility for awards." Regarding Sanofi's purported refusal to accommodate plaintiff's disabilities, as discussed below, plaintiff did not establish a prima facie claim for Sanofi failing to provide her with reasonable accommodations.

Sanofi does not contend that plaintiff's assertions that Sanofi denied her request for a cost of living raise, transferred her to a much less desirable position in a larger more onerous territory, and terminated her employment do not constitute adverse actions. We hold below that the trial court did not err in granting summary adjudication in favor of Sanofi on the issue that plaintiff's second cause of action for retaliation failed because Sanofi had legitimate, non-discriminatory reasons for taking the alleged adverse employment actions. A motion for summary adjudication is granted if it completely disposes of a cause of action. (Code of Civ. Proc., § 437c(f)(1).) We therefore do not

provide record citations for the 24 items and, therefore, has waived this contention. (*Miller v. Superior Court*, *supra*, 101 Cal.App.4th at p. 743; *Gotschall v. Daley*, *supra*, 96 Cal.App.4th at p. 481 fn 1.) In addition, plaintiff, however, has forfeited this contention by failing to make it before the trial court. (*Expansion Pointe Properties Limited Partnership v. Procopio, Cory, Hargreaves & Savitch, LLP* (2007) 152 Cal.App.4th 42, 54, ["'possible theories that were not fully developed or factually presented to the trial court cannot create a "triable issue" on appeal'"].)

reach the issue of whether the trial court erred in not ruling on issue No. 2— that plaintiff's second cause of action failed because plaintiff did not set forth sufficient facts to support a prima facie claim.

Sanofi had legitimate, non-discriminatory reasons for taking all alleged adverse employment actions that were allegedly in retaliation for plaintiff's protected activities. Regarding Sanofi's denial of plaintiff's request for a cost of living raise, Lee stated that Sanofi did not allow a cost of living increase. Lee also stated that he had been allocated a certain amount of money to give to his staff based on reviews, and he chose to give the majority of that money to one person, a man. Lee declared that he gave one person, a man, an "exceeds expectations" rating because, among other things, he assisted Lee in training other sales professional's in Lee's group. And, although it may not have been as much as plaintiff was hoping for, she received a raise of one percent of her salary.

Regarding Sanofi's transferring plaintiff to a much less desirable position in a larger more onerous territory, Sanofi reorganized its sales territories based on computer modeling. Sales professionals throughout the country were all affected equally; they too were assigned new territories and products. Regarding Sanofi's termination of plaintiff's employment, as discussed below, Sanofi had legitimate, non-discriminatory reasons for terminating plaintiff's employment. The trial court did not err in granting summary adjudication in favor of Sanofi on issue no. 3: that plaintiff's second cause of action fails because Sanofi had legitimate, non-discriminatory reasons for taking all alleged adverse employment actions.

### D. Disability Discrimination

Plaintiff's third cause of action is for actual disability discrimination, and her fourth cause of action is for perceived disability discrimination; they are alleged against Sanofi.

31

*1.        Applicable Law*

The "FEHA provides in pertinent part that it is unlawful for 'an employer, because of the . . . physical disability . . . .of any person, to . . . discharge the person from employment . . . or to discriminate against the person . . . in terms, conditions, or privileges of employment.' (§ 12940, subd. (a).).  Elsewhere the statute makes clear that its prohibition against discrimination on the basis of physical disability 'includes a perception that the person has any of those characteristics . . . .' (§ 12926, subd. (n).)" (*Rope v. Auto-Chlor System of Washington, Inc*. (2013) 220 Cal.App.4th 635, 655-656.) Under the FEHA, "disability" is broadly construed to protect employees and applicants from discrimination due to "an actual or perceived physical or mental impairment that is disabling, potentially disabling, or perceived as disabling or potentially disabling." (§ 12926.1, subd. (b).)  "The pivotal purposes of the [FEHA] are to prevent, eliminate and remedy workplace discrimination.  [Citations.]  [The] FEHA must be liberally construed to promote and accomplish its purposes.  [Citations.]" (*Rope v. Auto-Chlor System of Washington, Inc*., *supra*, 220 Cal.App.4th at p. 656.)

The essential elements of a disability discrimination claim are that the employee "(1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability." (*Sandell v. Taylor-Listug, Inc*. (2010) 188 Cal.App.4th 297, 310.)

*2.        Background Facts*

a)        Actual Disability Discrimination

Plaintiff's third cause of action for actual disability discrimination alleged that, "Plaintiff suffers from physical disabilities, specifically inability to use her left hand and arm, and chronic neck and back pain, and from mental disabilities, specifically acute anxiety disorder, which substantially limit major life activities (working and lifting, among other things).  Plaintiff therefore has a physical and mental disability under the

FEHA. [¶] . . . [¶] Plaintiff was subjected to a campaign of disability discrimination and unequal treatment . . ." because of her disability. Plaintiff also alleged "on information and belief that her disabilities [were] a motivating factor in the decision to terminate her, in violation of the FEHA."

Defendants' motion sought summary adjudication of issue no. 4: that plaintiff's third cause of action for actual disability discrimination failed because plaintiff cannot establish a prima facie claim, and of issue no. 5: that the cause of action failed because Sanofi had legitimate, non-discriminatory reasons for taking all alleged adverse employment actions.

The trial court granted summary adjudication in favor of Sanofi on issues 4 and 5. As to issue 4, the trial court stated, "Plaintiff does not establish in her opposition to summary adjudication that she suffered any physical or mental disabilities. The only evidence that plaintiff offered were notes from her physicians but the notes themselves are inadmissible over a hearsay objection. Plaintiff, further, offers no evidence that any of such alleged disabilities limited her major life activities. Plaintiff, moreover, offers no evidence that her disabilities were not accommodated by Sanofi once she complied with its requirements for verification of her claimed physical conditions. Plaintiff offers no evidence as to whether she was ever medically cleared to return to her employment. The absence of evidence on these points is fatal to plaintiff's cause of action for actual employment discrimination. [¶] Sanofi terminated plaintiff's employment because, as she did not qualify for another CFRA/FMLA absence after March 8, 2009, Sanofi was entitled to obtain medical justification for her continued absence from her job. Sanofi does not dispute that plaintiff did eventually provide a FMLA form, but it does offer testimony to dispute that the form and documentation were what it requested or were sufficient to justify her continued absence once her FMLA leave was exhausted."

In granting summary adjudication in favor of Sanofi on issue 5, the trial court stated, "The evidence is that Sanofi did accommodate plaintiff's documented medical conditions. The court shall not otherwise discuss Issue #5."

b) Perceived Disability Discrimination

Plaintiff alleged in her fourth cause of action for perceived disability discrimination, "[I]f Plaintiff's physical and mental conditions are not actual disabilities, Plaintiff alleges that Defendant perceived Plaintiff as suffering from physical disabilities, specifically inability to use her left hand and arm, and chronic neck and back pain, and from mental disabilities, specifically acute anxiety disorder, which substantially limit major life activities (working and lifting, among other things), in addition to a peanut allergy which Defendants perceived to be a disability. [¶] . . . [¶] Plaintiff alleges on information and belief that her perceived disabilities were a motivating factor in the decision to terminate her employment, in violation of the FEHA."

As to plaintiff's allegations in her fourth cause of action for perceived disability discrimination, defendants' motion sought summary adjudication of issue no. 6: that plaintiff's fourth cause of action fails because plaintiff cannot establish a prima facie claim, and of issue no. 7: that plaintiff's fourth cause of action fails because Sanofi had legitimate, non-discriminatory reasons for taking all alleged adverse employment actions.

The trial court granted summary adjudication in favor of Sanofi on issues 6 and 7. As to issue 6, the trial court stated, "Plaintiff states that Sanofi 'does not dispute that it knew of her disability,' but does not cite evidence for that assertion. In fact, Sanofi requested additional documentation to substantiate plaintiff's claim of a disability. . . ."

In granting summary adjudication in favor of Sanofi on issue 7, the trial court stated, "Plaintiff exhausted her FMLA benefits as of March 8, 2009, and she failed to provide documentation to Sanofi to justify a further medical accommodation. [Sanofi] accommodated plaintiff's documented medical conditions, and informed plaintiff of its need for further documentation to justify her further work absence. Plaintiff did not provide the required further documentation."

34

### 3. *Analysis*

#### a) Actual Disability Discrimination

Plaintiff alleged that she suffered from three actual physical or mental disabilities: the inability to use her left hand and arm; chronic neck and back pain; and mental disabilities, specifically acute anxiety disorder. Plaintiff's only proffered evidence that she actually suffered from those disabilities was notes from her doctors. The trial court, however, excluded this evidence as inadmissible hearsay, and plaintiff does not challenge this evidentiary ruling on appeal. The trial court therefore did not err in granting summary adjudication in favor of Sanofi on issue 4: that plaintiff's third cause of action for actual disability discrimination failed because plaintiff did not establish a prima facie claim.

Because we hold that the trial court did not err in granting summary adjudication in favor of Sanofi that plaintiff's third cause of action for actual disability discrimination failed because plaintiff did not establish a prima facie claim, that holding completely disposes of that cause of action. We, therefore, do not reach the issue of whether the trial court erred in granting summary adjudication in favor of Sanofi on issue 5: that the third cause of action failed also because Sanofi had legitimate, non-discriminatory reasons for taking all alleged adverse employment actions.

#### b) Perceived Disability Discrimination

Plaintiff alleged in her fourth cause of action for perceived disability discrimination that Sanofi perceived plaintiff as suffering from the following physical or mental disabilities: the inability to use her left hand and arm; chronic neck and back pain; mental disabilities, specifically acute anxiety disorder; and a peanut allergy which Sanofi perceived to be a disability. Plaintiff alleged that Sanofi's perception was a motivating factor in the decision to terminate her employment in violation of the FEHA.

Because, as discussed below, the trial court did not err in granting summary adjudication in favor of Sanofi on the issue that Sanofi had legitimate, non-discriminatory

35

reasons for terminating plaintiff's employment (issue 7), we do not decide whether the trial court erred in granting summary adjudication in favor of Sanofi on issue 6: that plaintiff's fourth cause of action for perceived disability discrimination failed because plaintiff did not establish a prima facie claim.

Sanofi contends that it had legitimate, non-discriminatory reasons for terminating plaintiff's employment. We agree with Sanofi.

Plaintiff was on an extended leave of absence for medical/emotional reasons and refused to provide requested information from her physicians, nor would she allow representatives of Sanofi to talk to the physicians.

On February 4, 2009, plaintiff emailed Sanofi stating that "[d]ue to recent events, my doctor has taken me out on a medical leave of absence. I have sent a doctor's note to CHS . . . ." On February 5, 2009, plaintiff submitted a request for an additional FMLA leave of absence, stating that she was unable to work for two months because of stress. According to the request for leave of absence, plaintiff 's condition was expected to last until April 3, 2009, during which time plaintiff was "unable to perform any of [her] job functions."

The next day, on February 6, 2009, Sanofi sent plaintiff a letter stating that she failed to provide CHS with medical documentation sufficient for approval of short term disability (STD) payments or continuation of leave and, therefore, plaintiff is on "unpaid and unapproved personal leave" commencing on January 29, 2008. ~(AA 215, 222)~ Although plaintiff claimed that she had forwarded the required information, Sanofi sent plaintiff a letter stating that, "Contrary to your contentions, as you have previously been informed, you have had not provided sufficient information to be approved for FMLA/CFRA leave or STD salary continuation benefits. Specifically, the FMLA leave request form that you submitted did not contain sufficient medical information to enable CHS to approve STD benefits."

On several occasions plaintiff refused to allow Sanofi to contact her physicians. Sanofi told plaintiff that, "CHS needs to verify the authenticity of the documentation. However, they are not independently able to do so because you have specifically

36

prohibited [Sanofi] or its agents from contacting your doctor. Accordingly, please provide [Sanofi] or its agents with authority to contact your doctor named in your previously submitted FMLA certification, or alternatively have the doctor send the documentation directly to CHS with the appropriate seal."

Plaintiff contends that she repeatedly referred Sanofi to her workers compensation attorney to obtain further medical information because, according to plaintiff, she was concerned about releasing more confidential medical information than was appropriate or necessary. This however is insufficient. It necessarily assumes that plaintiff's workers compensation attorney had possession of all of the responsive medical information, the information was in fact authentic, and the attorney in fact would provide Sanofi with all of the responsive medical information. Also, plaintiff's refusal to allow Sanofi to contact her doctors precluded Sanofi from exploring the medical records with them.

Sanofi sent plaintiff another letter stating that, "[You fail] to address the primary point of my March 25, 2009 request for authentication of the medical documents pertaining to your current, and continuing absence. . . . In the absence of proper authentication of the medical forms you provided for your current leave—either by allowing us to contact the doctor listed on the form, or by direct delivery of the documentation by the doctor to CHS with the appropriate stamp—we consider your documents insufficient to support medical leave. Consequently, your time out of work from January 29, 2009 until present is considered unapproved and remains unpaid. [¶] Therefore, you are required to immediately return to work to perform all duties associated with your Senior Sales Professional position. If you do not return to work on or before Monday, April 13, 2009, 8:00AM PST, you will be deemed to have abandoned your position and your employment will terminate on that date."

On April 16, 2009, Sanofi sent a letter to plaintiff, stating, "We have written to you on numerous occasions requesting authentication of the medical records pertaining to your most recent absence. Instead, you have patently ignored our requests . . . . [¶] As I informed you on April 9th, 2009, in the absence of documents or information supporting your leave, you were required to return to work . . . on April 13, 2009. Since you failed

37

to do so—in accordance with my prior warnings—you are considered to have abandoned your position and your employment with [Sanofi] is being terminated today."

Sanofi also sent plaintiff an e-mail stating, "[Sanofi] has received your request for leave under the [FMLA]. According to our records of the yours you submitted, you have not worked the required number of hours in the previous 12 months to be eligible for leave under the [FMLA] or the Company's Family Leave Policy. Therefore your time out of work from January 29, 2009 until present is considered unapproved and unpaid leave of absence."

Plaintiff contends that Sanofi's rationale for terminating her was pretextual because plaintiff declared that she did not abandon her job, that she had given Sanofi her doctor's work restrictions, had complained about sexual and ageist remarks of Lee and illegal kickback activities, and had requested reasonable accommodation and interactive process. This does not raise a triable issue of whether Sanofi's rationale for terminating her was pretextual. The bases for the termination are set forth in the foregoing letters to plaintiff. There are no material facts contradicting the assertions in those letters. The letters set forth adequate grounds for termination. Plaintiff asserts that notwithstanding the asserted grounds, there were other bases for the termination and the asserted grounds were pretextual.

Plaintiff contends that her employment was terminated because she had given Sanofi her doctor's work restrictions. But, plaintiff's only proffered evidence that she actually suffered from disabilities requiring work restrictions were notes from her doctors. As stated above, because the trial court excluded from evidence the notes from plaintiff's doctors, and plaintiff does not challenge that evidentiary ruling on appeal, there is no evidence that she actually suffered from her alleged disabilities requiring plaintiff to be entitled to work restrictions.

Plaintiff contends she was terminated because she complained about sexual and ageist remarks of Lee, on February 29, 2008, plaintiff sent an email to Weber stating that, "The problem at hand is that [Lee] has an unrelenting combative behavior towards me that consists of personal attacks, accusations and unprofessional behavior which, at times,

38

has become volatile, aggressive, disrespectful and includes negative, harassing and discriminatory comments pertaining to my age, and gender." The e-mail does not, however, identify specific incidents of sexual or age related statements made by Lee.

Plaintiff contends that her employment was terminated because she complained about alleged illegal kickback activities. Plaintiff asserts she complained about illegal activity in July, 2007 and reported it on February, 2008. She contacted the FDA in April and May of 2008. She was terminated almost one year later, on April 16, 2009 after the issues involving medical leave. Plaintiff has to show some causal link between the protected activity and the Company's termination decision, (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476-479), including the timing of the termination decision, the person making the decision to terminate, and the employee's performance before termination. (*Id.* at p. 479.) Here, the termination was almost one year after the protected activity. It was the Human Resources Department—Trautman—who corresponded with plaintiff and terminated her. There is no evidence as to who made the decision to terminate plaintiff and that the decisionmaker knew about the protected activity. And plaintiff's medical leave issues that affected her performance immediately preceded termination.

Plaintiff, to raise a triable issue of fact, must "produce substantial responsive evidence to show that [defendant's] ostensible motive was pretextual; that is, 'that a discriminatory reason more likely motivated the employer or that the employer's explanation is unworthy of credence.' [Citation.]" (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433.) Plaintiff's subjective beliefs "do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations. (*Ibid.*) Plaintiff's "evidence must relate to the motivation of the decision makers to prove, by nonspeculative evidence, an actual causal link between prohibited motivation and termination." (*Id.* at pp. 433-434.) Here, no inference can be drawn that the termination was a result of the protected acts. All of the factors—timing, person terminating, and performance all result in a contrary inference that plaintiff has not rebutted. (See *Clark*

*County School Dist. v. Breeden* (2001) 532 U.S. 268, 273-274 [temporal proximity must be close].)

Plaintiff was terminated when her FMLA medical leave was exhausted and she failed to provide documentation for a further medical accommodation. As to plaintiff's contention that she was terminated because she had requested reasonable accommodation and interactive process, as noted below, plaintiff did not establish that Sanofi failed to provide reasonable accommodation or engage in the interactive process.

Sanofi had legitimate, non-discriminatory reasons for terminating plaintiff's employment. The trial court therefore did not err in granting summary adjudication in favor of Sanofi on issue 7.

### E.     Failure to Provide Reasonable Accommodation

The fifth cause of action is for failure to provide reasonable accommodation, alleged against Sanofi.

#### 1.     *Applicable Law*

"The elements of a failure to accommodate claim are (1) the plaintiff has a disability under the FEHA, (2) the plaintiff is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's disability. [Citation.]" (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1009-1010.)

#### 2.     *Background Facts*

Plaintiff's fifth cause of action alleged that, "Plaintiff repeatedly requested a reasonable accommodation to allow her to return to work. Defendants ignored her requests and failed and refused to discuss the matter with her, much less offer any sort of accommodation. [¶] Plaintiff could have performed the essential functions of her job with reasonable accommodation. [¶] Because of Defendants' refusal to provide

reasonable accommodation, Plaintiff was unable to perform her job without violating her work restrictions and Defendants terminated Plaintiff's employment."

Defendants' motion sought summary adjudication of issue no. 8: that plaintiff's fifth cause of action failed because plaintiff cannot establish a prima facie claim. The trial court granted summary adjudication in favor of Sanofi on this issue, stating, "Plaintiff's allegations of Sanofi's refusal to accommodate are based on three restrictions: (1) no air travel; (2) no standing/walking for more than 8 hours per day; and (3) no lifting of things over a specified weight. Sanofi, according to the undisputed evidence, engaged in a substantial interactive process with plaintiff to determine accommodations for all of her disabilities. [¶] Sanofi discussed and offered accommodations for these limitations. Sanofi met the lifting restrictions by allowing her to take written notes instead of carrying laptop; allowing her not to carry samples; and offering to help her with her baggage on a business trip. . . . Sanofi also met the 8 hour workday restrictions. [¶] As to the travel restrictions, Sanofi was not required to provide local training for plaintiff, provided other accommodations are offered. See, Wilson v. County of Orange (2009) 169 Cal.App.4th 1185, 1194. Sanofi offered training sessions in New Jersey with on-site physical therapy. . . . Plaintiff claims Sanofi 'pressured the doctors' office to change' the no-travel restrictions to force her to travel to New Jersey, but plaintiff does not offer any declaration from a health care professional to back up her speculative assertion."

### 3. Analysis

On appeal, plaintiff contends that Sanofi failed to provide reasonable accommodation based on her disability restrictions of (1) no lifting of things over a specified weight; (2) no working longer than eight hours a day; and (3) no travel during a two-week period because of a sinus infection. Fatal to plaintiff's contention, however, is that an essential element of her a failure to accommodate claim is that the plaintiff have a disability under the FEHA. (*Scotch v. Art Institute of California*, *supra*, 173 Cal.App.4th at pp. 1009-1010). As noted above, because the trial court excluded from evidence the notes from plaintiff's doctors, there is no evidence that she actually suffered from her

41

alleged disabilities.  The trial court did not err in granting summary adjudication in favor of Sanofi on issue no. 8: that plaintiff's fifth cause of action failed because plaintiff did not establish a prima facie claim.

### F.    Failure to Engage in the Interactive Process

Plaintiff's sixth cause of action is for failure to engage in the interactive process, asserted against Sanofi.

#### 1.    *Applicable Law*

The essential elements of a cause of action for failure to engage in an interactive process are: (1) the plaintiff has a disability that was known to his employer, (2) the plaintiff requested that his employer make a reasonable accommodation for that disability so he would be able to perform the essential job requirements, (3) the plaintiff was willing to participate in an interactive process to determine whether a reasonable accommodation could be made, (4) the employer failed to participate in a timely, good faith interactive process with the plaintiff, (5) the plaintiff was harmed, and (6) the employer's failure to engage in a good faith interactive process was a substantial factor in causing the plaintiff's harm.  (CACI No. 2546.)

#### 2.    *Background Facts*

Plaintiff alleges in her sixth cause of action, "Plaintiff repeatedly requested a reasonable accommodation to allow her to return to work.  Defendants ignored her requests and failed and refused to discuss the matter with her, much less offer any sort of accommodation.  Defendants violated the provisions of Section 1294(n) of the Government Code, and Code of Regulations by failing to engage in a timely, good faith, interactive process with Plaintiff to determine effective reasonable accommodations despite their knowledge of her disabilities and/or perceived disabilities.  [¶]  Plaintiff could have performed the essential functions of her job with reasonable accommodation.  [¶]  Because of Defendants' refusal to provide reasonable

42

accommodation, Plaintiff was unable to perform her job without violating her work restrictions and Defendants terminated Plaintiffs employment."

Defendants' motion sought summary adjudication of issue no. 9: that plaintiff's sixth cause of action failed because plaintiff cannot establish a prima facie claim. The trial court granted summary adjudication in favor of Sanofi on this issue, stating, "See the discussion as to Issue #8. Plaintiff, in this case, caused a breakdown in the interactive process by prohibiting the company from communicating with her health care professionals to obtain further documentation of her medical needs. . . . Sanofi engaged in the interactive process as much as it could but was frustrated by plaintiff's own failure to engage interactively to identify accommodations for her evolving health issues.

### 3. Analysis

An essential element of a failure to engage in an interactive process claim is that the plaintiff have a disability (CACI No. 2546) and, as noted above, there is no evidence that she suffered from her alleged disabilities. In addition, plaintiff caused a breakdown in the interactive process by prohibiting Sanofi from communicating with her health care professionals to obtain further documentation of her medical needs. The trial court did not err in granting summary adjudication in favor of Sanofi on issue no. 9: that plaintiff's sixth cause of action failed because plaintiff did not establish a prima facie claim.

## G. Wrongful Termination in Violation of Public Policy—FEHA

The seventh cause of action is for wrongful termination "in violation of public policy in the FEHA" alleged against Sanofi.

### 1. Applicable Law

The elements of a claim for wrongful discharge in violation of public policy are (1) an employer-employee relationship, (2) the employer terminated the plaintiff's employment, (3) the termination was substantially motivated by a violation of public policy, and (4) the discharge caused the plaintiff harm. (CACI 2430.)

## 2. *Background Facts*

Plaintiff alleged in her seventh cause of action, "Defendants violated the public policy of California, as set forth in the California Constitution art. I, section 8, Title VII of the Civil Rights Act of 1964, the provisions of Section 12940(a), (h), (k), (m) and (n) of the California Government Code, and the applicable California Regulations, by engaging and employing the practices that resulted in discrimination and harassment against Plaintiff as a result of her complaints regarding harassment, and actual and/or perceived physical and mental disabilities."

Defendants' motion sought summary adjudication of issue no. 10: that plaintiff's seventh cause of action for wrongful termination "in violation of public policy in the FEHA" failed because plaintiff cannot establish a prima facie claim in that "she cannot establish the underlying violations upon which the claim is based." The trial court denied summary adjudication in favor of Sanofi on this issue, stating, "Plaintiff contends that Sanofi paid honorariums to physicians to encourage them to prescribe Sanofi's products. Plaintiff asserted this contention to fellow reps . . . and also directly to FDA personnel. Plaintiff may maintain a wrongful termination claim even if her assertion of wrongful conduct is not correct. Plaintiff need have only a reasonable belief that an employer's actions violate constitutional, statutory or regulatory law to allege a claim for wrongful termination. Plaintiff's seventh cause of action fails on a different basis: plaintiff does not raise a triable issue that her termination was a consequence of her complaints about Sanofi's practices. She was terminated when her FMLA medical leave was exhausted and she failed to provide documentation for a further medical accommodation."

## 3. *Analysis*

The trial court denied summary adjudication in favor of Sanofi on issue no. 10: that plaintiff's seventh cause of action for wrongful termination "in violation of public policy in the FEHA" failed because plaintiff cannot establish a prima facie claim in that "she cannot establish the underlying violations upon which the claim is based." As noted above and by the trial court, plaintiff does not raise a triable issue that her termination

44

was a consequence of her complaints about Sanofi's practices allegedly in violation of FEHA.

Although Trautman, in Sanofi's human resources department, advised plaintiff that Sanofi was terminating her employment, plaintiff has not provided evidence of the person at Sanofi who made the decision to terminate plaintiff's employment, and that the person knew that plaintiff had, as alleged, "made complaints regarding harassment, and actual and/or perceived physical and mental disabilities." Trautman advised plaintiff that her employment was terminated because her FMLA medical leave had been exhausted and she failed to provide documentation for a further medical accommodation. The trial court properly granted summary adjudication in favor of Sanofi on the issue that plaintiff's seventh cause of action has no merit.

## H.     Violation of Labor Code Section 1102.5

Plaintiff's eighth cause of action against defendants is for violation of Labor Code section 1102.5, and her ninth cause of action against Sanofi is for wrongful termination "in violation of public policy Labor Code section 1102.5."

### 1.     Applicable Law

"An employer . . . shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties." (Lab. Code, § 1102.5, subd. (b).)

### 2. Background Facts

#### a) Wrongful Termination in Violation of Labor Code section 1102.5

Plaintiff alleged in her eighth cause of action for violation of Labor Code section 1102.5, that, "In the course of her employment, Plaintiff became aware that some of her co-workers, with the knowledge and ratification of her boss Lee, were unlawfully signing up doctors to provide speaking services (presentations) on behalf of [Sanofi], for which the doctors were paid significant fees, in exchange for the doctors increasing their prescriptions for [Sanofi] products. These kickbacks are illegal and in violation of the Anti-Kickback Act of 1986, 42 U.S.C. Section 1320a-7b et seq. Further, [Sanofi]'s U.S. Code of Business Conduct specifically prohibits paying doctors for speaking services in exchange, directly or indirectly, for the doctor's increasing the frequency with which the doctor prescribes [Sanofi]'s products to patients. 'Hiring a physician must never be based on the intent to influence prescribing practices or formulary decisions.' [¶] Plaintiff refused to participate in this conduct and complained internally to her boss, and to Human Resources, regarding this illegal conduct. [Sanofi] took no action in response to her complaints. According, in or about May 2008, Plaintiff went to the FDA to inform that agency concerning the illegal practices at [Sanofi] in violation of the Anti-Kickback statutes. Plaintiff informed [Sanofi] concerning her report to the FDA. [¶] After her complaints, Defendants engaged in a systematic attempt to get rid of her . . . . Plaintiff is informed and believes and thereon alleges that her termination was motivated by her report to the FDA. [¶] These actions by Defendants violated California Labor Code Section 1102.5, which prohibits an employer from retaliating against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

46

Defendants' motion sought summary adjudication of issue no. 11: that plaintiff's eighth cause of action fails because plaintiff cannot establish a prima facie claim, and of issue no. 12: that plaintiff's eighth cause of action fails because Sanofi had legitimate, non-discriminatory reasons for taking all alleged adverse employment actions.

The trial court granted summary adjudication in favor of defendants on issues 11 and 12. As to issue 11, the trial court stated, "To establish a prima facie case of retaliation under California's whistle blower statute, plaintiff must offer evidence that will raise a triable issue of fact that (1) she engaged in protected activity; (2) her employer subjected her to adverse employment action; and (3) there is a causal link between the two. Muniz v. United Parcel Service, Inc. (N.D. Cal. 2010) 731 F.Supp.2d 961. Plaintiff's evidence fails on criteria (2) and (3). Plaintiff's termination resulted in her exhaustion of further medical leave and failure to provide medical documentation for further absence from work." The trial court did not state its rationale in granting summary adjudication in favor of defendants on issue 12.

> b)      Wrongful Termination in Violation Of Public Policy—
> Labor Code Section 1102.5

Plaintiff's ninth cause of action alleged that, "Plaintiff is informed and believes and thereon alleges that her termination was motivated by her report of illegal conduct to [Sanofi], to the FDA and/or her refusal to engage in the illegal practices. Accordingly, her termination was in violation of substantial, fundamental public policies, as reflected in Anti-Kickback Act of 1986, 42 U.S.C. Section 1320a-7b et seq. and California Labor Code Section 1102.5."

Defendants' motion sought summary adjudication of issue no. 13: that plaintiff's ninth cause of action failed because plaintiff cannot establish a prima facie claim as she cannot establish an underlying violation of section 1102.5. The trial court granted summary adjudication in favor of Sanofi on this issue, stating that is was based on the "analysis above."

47

*3.     Analysis*

Plaintiff contends that she was terminated because she contacted the FDA about defendants' alleged illegal "kickback activities" in violation of Labor Code Section 1102.5.  Plaintiff does not raise a triable issue that her termination was a consequence of her complaints to the FDA about defendants' alleged participation in such illegal activities.  Plaintiff did not provide evidence of the person at Sanofi who made the decision to terminate plaintiff's employment, and that the person knew that plaintiff had contacted the FDA about defendants' alleged illegal "kickback activities."  As discussed above, Trautman notified plaintiff that her employment with Sanofi was terminated because plaintiff's FMLA medical leave was exhausted and she failed to provide documentation for a further medical accommodation.  And, as discussed above, other factors militate against any inference that the termination was a pretext in connection with protected activity.

The trial court did not err in granting summary adjudication in favor of defendants on issue no. 11: that plaintiff's eighth cause of action fails because plaintiff did not establish a prima facie claim, and of issue no. 12:  that plaintiff's eighth cause of action fails because Sanofi had legitimate, non-discriminatory reasons for taking all alleged adverse employment actions.  The trial court similarly did not err in granting summary adjudication in favor of Sanofi on issue no. 13: that plaintiff's ninth cause of action failed because plaintiff did not establish a prima facie claim as she did not establish an underlying violation of section 1102.5.

## I.     Intentional Infliction of Emotional Distress

The tenth cause of action is for intentional infliction of emotional distress, alleged against defendants.

*1.     Applicable Law*

"The elements of a cause of action for intentional infliction of emotional distress are: '"(1) outrageous conduct by the defendant, (2) intention to cause or reckless

48

disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of the emotional distress."' [Citation.]" (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1376.) "The California Supreme Court has set a 'high bar' for what can constitute severe distress. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1051 [95 Cal.Rptr.3d 636, 209 P.3d 963] (*Hughes*).) 'Severe emotional distress means "'emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.'" [Citations.]' [Citations.]" (*Ibid.*)

### 2. *Background Facts*

Plaintiff in her tenth cause of action alleged, "Defendants' actions as described above were done with the intent to cause Plaintiff severe emotional distress, or with reckless disregard for the same. [¶] As a result of Defendants' wrongful actions, Plaintiff has suffered and will continue to suffer severe emotional distress."

Defendants' motion sought summary adjudication of issue no. 14: that plaintiff's tenth cause of action failed because plaintiff cannot establish a prima facie claim. The trial court granted summary adjudication in favor of defendants on this issue, stating, "Plaintiff does not offer evidence that raises a triable issue that Sanofi's conduct toward her meets the standard of 'extreme and outrageous conduct' that is intended to cause emotional distress. See Cervantez v. J.C. Penney Co. (1979) 24 Cal.3d 579, 793."

### 3. *Analysis*

In order to establish a claim for intentional infliction of emotional distress, plaintiff must show that the purported conduct was extreme and outrageous. (*Chang v. Lederman* (2009) 172 Cal.App.4th 67, 86-87; accord, *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 300.) "Extreme and outrageous conduct is conduct that is ""so extreme as to exceed all bounds of that usually tolerated in a civilized community""" [citation] and must be "'of a nature which is especially calculated to cause, and does

49

cause, mental distress.'" [Citation.]" (*Chang v. Lederman, supra*, 172 Cal.App.4th at pp. 86-87.)

As noted above, "The California Supreme Court has set a high bar' for what can constitute severe distress. [Citation.]" (*Wong v. Jing, supra*, 189 Cal.App.4th at p. 1376.) The Supreme Court has held that a plaintiff's assertions that the defendant's conduct caused her to suffer "discomfort, worry, anxiety, upset stomach, concern, and agitation" did not constitute the substantial or enduring emotional distress that would support a cause of action for intentional infliction of emotional distress. (*Hughes, supra*, 46 Cal.4th at p. 1051.) In *Wong v. Jing, supra*, 189 Cal.App.4th 1354, the plaintiff claimed that the defendant's conduct was "very emotionally upsetting" and caused her to lose sleep and to have an upset stomach and generalized anxiety. The Court of Appeal held that the plaintiff had not shown emotional distress that was any more "severe, lasting, or enduring" than the emotional distress shown by the Hughes plaintiff. (*Id.* at p. 1377.) Thus, the plaintiff's reaction did not "constitute the sort of severe emotional distress of such lasting and enduring quality that no reasonable person should be expected to endure. [Citation.]" (*Ibid*.)

As the trial court stated, plaintiff does not offer evidence that raises a triable issue that Sanofi's conduct toward her meets the standard of "extreme and outrageous conduct" that is intended to cause emotional distress. The trial court did not err in granting summary adjudication in favor of defendants on issue no. 14: that plaintiff's tenth cause of action failed because plaintiff did not establish a prima facie claim.

## I. Supplemental Briefing

Plaintiff requests supplemental briefing to include additional evidence that plaintiff purportedly did not have an adequate opportunity to present evidence. After plaintiff's opposition to defendants' motion was due, plaintiff filed an ex parte application to continue the hearing on the motion, and the trial court granted a continuance of the hearing. After plaintiff opposed defendants' motion, the trial court again continued the hearing on the motion. There is no reason why any issue could not

have been raised in the briefing. Moreover, there is no showing of any abuse of discretion by the trial court in connection with the schedule for the summary judgment proceedings. We deny plaintiff's request.

**DISPOSITION**

The judgment is affirmed. Defendants are awarded their costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


                                          MOSK, Acting P.J.


We concur:



        KRIEGLER, J.



        MINK, J. [*]



---

[*]      Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.